48 P.3d 605

STATE of Hawai'i, Plaintiff–Appellee,

v.

Habib SHABAZZ, also known as "T–Bone", Defendant–Appellant, and Mario Crawley, also known as "Quick", Harvey Carvis, James Shakespeare, Meka Ugoezi, and Lloyd Swanson, Defendants.

and

State of Hawai'i, Plaintiff–Appellee,

v.

Mario Crawley, also known as "Quick", Defendant–Appellant, and Habib Shabazz, also known as "T–Bone", Harvey Carvis, James Shakespeare, Meka Ugoezi, and Lloyd Swanson, Defendants.

Nos. 23571, 23575.

Intermediate Court of Appeals of Hawai'i.

May 20, 2002.

Reconsideration Denied June 6, 2002.

Certiorari Denied June 28 and July 15, 2002.

Michael G. Ostendorp, Honolulu, on the briefs, for Defendant–Appellant Shabazz.

Glenn D. Choy, Honolulu, on the briefs, for Defendant–Appellant Crawley.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee in No. 23571.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee in No. 23575.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

On May 9, 2000, the circuit court of the first circuit entered a judgment against Defendant–Appellant Mario Crawley (Crawley, nicknamed "Quick")[1] that convicted him of sexual assault in the second degree[2] and attempted sexual assault in the second degree.[3] On the same day, the court entered a judgment against Defendant–Appellant Habib Shabazz (Shabazz, nicknamed "T–Bone") that convicted him of sexual assault in the second degree. Crawley appealed (No. 23575). Shabazz appealed (No. 23571). We consolidated the two appeals for the purpose of issuing a decision.

During his opening statement at the trial of Crawley and Shabazz, the prosecutor made irrelevant and inflammatory references to race. Following the opinion of the Hawai'i Supreme Court in *State v. Rogan*, 91 Hawai'i 405, 984 P.2d 1231 (1999), we vacate the judgments and remand for a new trial.

## I. Background.

On April 14, 1999, the grand jury indicted Crawley for one count of sexual assault in the first degree[4] and two counts of attempt-

1. In the record, the attorneys for Defendant Appellant Mario Crawley refer to him as "Marlo Crawley," not "Mario Crawley."

2. Hawai'i Revised Statutes (HRS) § 707–731(1)(a) (1993 & Supp.2001) provides that "[a] person commits the offense of sexual assault in the second degree if: . . . The person knowingly subjects another person to an act of sexual penetration by compulsion[.]" (Enumeration omitted.) HRS § 707–700 (1993) defines "compulsion" as "absence of consent, or a threat, express or implied, that places a person in fear of public humiliation, property damage, or financial loss." According to HRS § 707–700, "sexual penetration" means "vaginal intercourse, anal intercourse, fellatio, cunnilingus, anilingus, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the

genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required. For purposes of this chapter, each act of sexual penetration shall constitute a separate offense."

3. HRS § 705–500(1)(b) (1993) provides that "[a] person is guilty of an attempt to commit a crime if the person: . . . . Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime." (Enumeration omitted.)

4. HRS § 707–730(1)(a) (1993 & Supp.2001) provides that "[a] person commits the offense of sexual assault in the first degree if: . . . The person knowingly subjects another person to an

ed sexual assault in the first degree. The grand jury indicted Shabazz for one count of sexual assault in the first degree. Each of the other Defendants—Lloyd Swanson (Swanson), Harvey Carvis (Carvis),[5] James Shakespeare (Shakespeare) and Meka Ugoezi (Ugoezi)—was indicted under two counts as an accomplice [6] to Crawley and Shabazz, respectively, with respect to the offense of sexual assault in the first degree.

On November 30, 1999, Carvis filed a motion to suppress the complaining witness's (Complainant) pretrial identification of him. Shakespeare and Ugoezi joined in the motion. In his motion, Carvis alleged that the identification procedures used were "impermissibly suggestive, inherently unreliable and conducive to irreparable misidentification[.]"

At the February 2, 2000 hearing on the motion, Detective Sheryl Sunia (Detective Sunia), the Honolulu police detective assigned to the case, testified that shortly after the incident in question, she interviewed Complainant at the police station. The interview was audiotaped and videotaped. Complainant told Detective Sunia that six males were involved in the incident. Although Complainant could provide a limited description of each suspect, she was unable to identify any of the suspects by name. She was, however, able to identify Crawley and Shabazz by their nicknames. Detective Sunia asked Detective Mark Wiese (Detective Wiese) and Officer Rohn Hamasaki (Officer Hamasaki) about the names behind the nicknames and was able to construct photo lineups that included Crawley and Shabazz. Detective Sunia was not able to get an iden-

tification of the other four suspects in this manner.

At one point during the interview, Detective Sunia had to leave the interview room for "maybe four minutes." She turned off the audiotape as she left. In her absence, Detective Wiese turned off the videotape. Detective Wiese and Officer Hamasaki showed Complainant a vinyl folder containing color photographs of possible suspects. "They wanted—they had information of possible other males, photographs of other males who [ (sic) ] could possibly help identify the additional four males." Detective Sunia was surprised to learn that Detective Wiese had turned off the videotape. At various times during and after Complainant's interview with Detective Wiese and Officer Hamasaki, Complainant was able to identify Carvis, Shakespeare and Ugoezi.

Detective Sunia explained how the vinyl folder of color photos came to be:

When I had informed him [ (Officer Hamasaki) ] of the two names [ ("Quick" and "T–Bone") ] and identification had been made, I had requested if he had any photos or anything that would link to any type of prostitution activity. And that's what was—he said he got—he could give me some photos.

. . . .

It was explained to me that they were members of the Abyss. And my information that was provided to me that these members of quote, "the Abyss gang," were involved in prostitution.

The information provided to Detective Sunia came from Detective Wiese and Officer Ha-

---

act of sexual penetration by strong compulsion[.]" (Enumeration omitted.) HRS § 707–700 defines "strong compulsion" as "the use or attempt to use one or more of the following to overcome a person: (1) A threat, express or implied, that places a person in fear of bodily injury to the individual or another person, or in fear that the person or another person will be kidnapped; (2) A dangerous instrument; or (3) Physical force."

**5.** At a pretrial hearing, Defendant Harvey Carvis informed the court that his name is Carvis Harvey. In order to maintain consistency in the transcripts, pleadings, other documents and cap-

tioning in this case, we will, with apologies, continue to refer to Mr. Harvey as "Carvis."

**6.** HRS § 702–221(2)(c) (1993) provides that "[a] person is legally accountable for the conduct of another person when: .... He is an accomplice of such other person in the commission of the offense." (Enumeration omitted.) HRS § 702–222(1)(b) (1993) provides that "[a] person is an accomplice of another person in the commission of an offense if: ... With the intention of promoting or facilitating the commission of the offense, the person: .... Aids or agrees or attempts to aid the other person in planning or committing it[.]" (Enumeration omitted.)

masaki, and from the Federal Bureau of Investigation.

During Complainant's testimony at the suppression hearing, it became apparent that her account of the identification procedures differed markedly from Detective Sunia's. Most startling was Complainant's clear and adamantine denial that she ever saw the vinyl folder of color photos from which she had allegedly made identifications.

The court granted the motion to suppress on February 15, 2000. Carvis, Shakespeare and Ugoezi thereupon filed motions to dismiss the adverse counts of the indictment with prejudice. During the hearing on the motions to dismiss, the court commented:

> And I'll be very honest, perfectly honest, I was rather appalled and very deeply disturbed by the process that has unfolded in the suppression hearing. Deeply, deeply disturbed by the process.
>
> Nonetheless, looking at all of the evidence ... it's clearly [ (sic) ] that the identification procedure, at least as it pertains to these three defendants, just simply did not occur, something else was going on. I don't know what was going on, something else occurred. I don't know what it is, I don't think anyone knows at this point.....

The court dismissed all counts of the indictment against Carvis, Shakespeare and Ugoezi, without prejudice.

Jury trial for the remaining Defendants—Crawley, Shabazz and Swanson—commenced on February 28, 2000.[7] After the first day of jury selection, the following colloquy occurred outside of the presence of the jury:

> [CRAWLEY'S COUNSEL]: For the record, I object to the venire as constituted. I don't know the exact number that actually responded to the call for prospective jurors but there was one Afro-American in the entire composition and I don't believe that that array is sufficient based on the nature of this case and the ethnic background of my client. So the record is clear, the fact that I participated in the voir dire was not considered to be a waiver of that objection.

> . . . .

> [SHABAZZ'S COUNSEL]: Your honor, same observation. There was only one person that I saw of Afro–American—

> THE COURT: That you determined?

> [CRAWLEY'S COUNSEL]: Appeared to be.

> [SHABAZZ'S COUNSEL]: Appeared to be. And I believe the case is—

> THE COURT: All right. That's fine. And you join, you're joining as well, [Swanson's counsel]?

> [SWANSON'S COUNSEL]: Yes, your honor. And the record should reflect that all defendants are black.

> . . . .

> I'm requesting a mistrial.

> THE COURT: You'd like a mistrial. Is that a motion for a mistrial?

> [SWANSON'S COUNSEL]: Yes.

> THE COURT: That motion is denied.

The prosecutor began his opening statement, thus:

> Thank you.
>
> Good afternoon, ladies and gentlemen.
>
> This case is going to be about an attempt to *gang rape* a *young local woman*.
>
> The evidence in this case is going to show that on October 19th, 1998, defendants Crawley and Shabazz sexually assaulted *a young 17 year old local woman* at a Waikiki hotel room. They committed these crimes of sexual assault by knowingly subjecting *this young local woman* to multiple acts of sexual penetration and multiple acts of attempted sexual penetration.
>
> The evidence is going to show that they were able to accomplish this sex assault by using force to overcome the will of the victim and by using the presence of four of their friends in the hotel room to surround the bed and to create an intimidating, coercive and hostile environment for the victim. The evidence will show that defendant Swanson, over there at the end, was one of those four accomplices in the room who was present and participated by helping to

---

7. The Honorable Sandra A. Simms, judge presiding.

surround the bed and, thus, trapping the victim, by encouraging Crawley and Shabazz to sexually assault this young woman, by making intimidating and threatening remarks to her during this attack.

There's going to be several names that you're going to hear during the course of the trial.

The first is [Complainant]. She is the alleged victim in this case. *She's a young local woman born and raised here in Hawaii.* She was 17 years old at the time of this incident. And today she's 18.

You'll also obviously hear the names of the defendants, 28–year–old Mario Crawley, 22–year–old Habib Shabazz, and 20–year–old Lloyd Swanson.

(Emphases supplied.) Later on in his opening statement, the prosecutor described the prelude to the alleged sexual assaults:

So at that point she opens the bathroom door and looks out into the room and she sees that there are *six African–American males* in the room now. Defendant Quick, T–Bone, Swanson and three other men are in the room at this point. And at this point, [Complainant] starts to think something bad is going to happen. She begins to feel vulnerable, half naked, and basically outnumbered.

Again, she came out of the bathroom to get her clothes, but instead of giving her her clothes, these six men surrounded her on the bed in the hotel room and at that point she knew that something definitely bad was going to happen to her. She knew that her life was about to change at that point.

. . . .

You'll hear that she was surrounded by six men who were taller than her, heavier than her, older than her, and stronger than her. She was basically outnumbered and essentially trapped in that hotel room with both the front door and the sliding glass room door closed. And she knew, as she'll tell you, that there was no way that she was going to physically overcome six peo-

ple and physically fight her way out of that.

(Emphasis supplied.)

Immediately after the prosecutor finished his opening statement, the following dialogue took place:

THE COURT: [Crawley's counsel], did you wish to make an opening statement *now*?

[SWANSON'S COUNSEL]: I want to make some objections at the bench, your honor.

THE COURT: Okay.

[CRAWLEY'S COUNSEL]: The answer is yes.

THE COURT: Before we do that, [Crawley's counsel], there's something [Swanson's counsel] wants to take up at the bench.

[CRAWLEY'S COUNSEL]: I'll be with you.

(The following proceedings were held at the bench:)

THE COURT: What's the objection?

[SWANSON'S COUNSEL]: Your honor, I have two objections. Actually I'm making a motion for dismissal with prejudice, or an alternative, for a mistrial, and the basis is that [the prosecutor's] opening statements are racist in nature. He's repeatedly stated that this was a young local woman, a young local woman. And then he adds to the fire that now she's surrounded by six African–American males and, your honor, that's about as racist as you can get, pinning [ (sic) ] a local person against six black men. He didn't have to say African–American males. Pretty obvious. He didn't have to say local. When she comes, they'll see. But this reference in opening statements definitely is racist in nature, and I ask that you dismiss this case with prejudice or that we have a mistrial.

THE COURT: Is that joined by anyone?

[CRAWLEY'S COUNSEL]: I just join. No argument.

[SHABAZZ'S COUNSEL]: Join the argument.

THE COURT: [Mr. Prosecutor].

[PROSECUTOR]: Well, your honor, I think the evidence will show that she was a young local woman, 17. The jury will obviously see that she is local, born and raised here in Hawaii, so that's what the evidence is going to show.

As far as the defendants, the evidence will show that as well.

THE COURT: Well, that's kind of—so if we're making reference over and over again, it could be perceived as being—someone could see that that's being a ploy to appeal to that. I mean, obviously when they see her and they see the defendants, they're what they are, so I think we need to refrain from that kind of argument at this point.

[CRAWLEY'S COUNSEL]: We're not going to do it but it's already been done for 40 minutes.

[PROSECUTOR]: Well, your honor—

THE COURT: We're not going to hear any more argument until closing. Certainly in closing argument, I don't think that we're going to hear that approach this way.

[SWANSON'S COUNSEL]: One more thing.

THE COURT: That request for a mistrial is denied.

In his opening statement, Crawley's attorney limned the general outline of Crawley's defense:

October 19th, 1998, [Complainant] in fact went to the beach. She's there for a period of time, ... and then she leaves the beach to go to Ala Moana [Shopping Center.] ...

She takes a bus. She gets off the bus and she's going to take another bus to go around Ala Moana [Shopping Center] when a car pulls up. There is no question that the driver of the car is [Crawley]. She identifies the passenger as being someone named T–Bone. She never met them before in her life. She never had a personal relationship with them in her life, and I promise you she will say that to you. She, in fact, had never spent time with either man.

. . . .

Within moments of [Crawley] walking up to her, she decides to kick it. That's a term she knew, which meant spend time with these two men, and it was her decision within seconds to spend the whole day with them.

. . . .

She gets into the car with these two men with the intent of spending the day with them. Within a period of time after that, she asks them to take her home to get clean clothes. . . . .

When they drive her back to where she is staying, she makes the decision to take a shower in whatever hotel room they're in, not to take a shower where she lives, and there was no rush. To take a shower in a hotel room where they're staying.

The evidence will be she thought it was cool and it would be cool to take a shower in that room and spend the day with them. And the demo tape they were listening to was a group called The Abyss and she told [Crawley] and the other man she wanted to meet some of those people who made the demo tape.

. . . .

In the car the men were smoking marijuana[.] . . . .

The men go down to the Coconut Plaza [Hotel] but before they do, what you didn't hear yet was they stopped off and got some whiskey, some Hennessey's.

. . . .

[Crawley] and [Complainant] walk into the Coconut Plaza Hotel alone. The gentlemen she called T–Bone drove away. They go up to room 402 and they both go inside. In fact, [Crawley] and [Complainant] were alone in that room for a long time. They were alone in that room for hours.

. . . .

They had sex together, the evidence will be, and it was consensual and that's why she went back into the bathroom[.] ... When she's in the bathroom cleaning up, and it's a small room, she didn't have to open the door to hear there's a lot of guys coming in.

You will hear she thought this young man sitting here, [Shabazz], had pretty eyes. And she asked [Crawley] to call him back and she wanted to meet some of these gentlemen who were supposedly rappers.

What happened after that was that there was an argument. Some of these men were very unkind to her physically. She started telling them about what she thought about their singing and their rapping, and I can't tell you how much she had to drink. And then they started calling her names and she got angry and she got up and she ran out and left.

Shabazz's opening statement showed that his defense was essentially aligned with Crawley's, with additional allegations pertinent to the former:

[Complainant] sits in the back of the car. They don't surround her in the car. She sits in the back. They go down to the hotel because she wanted to take a shower. The hotel—she wanted to take a shower and she wanted to be with [Crawley] and they went.

[Shabazz] left. [Shabazz] left sometime thereafter. [Shabazz] was called back. [Shabazz] was called back because he was told she wanted to see him. She wanted the person with the green, pretty eyes. That is what she wanted. And [Shabazz] returned.

. . . .

Now, [Shabazz] returned as requested, as asked by [Complainant]. He returned. You'll hear evidence—we're not going to insult you by telling you that [Shabazz] did not have consensual sex or did not have sex with [Complainant]. He did. But the issue is consent.

Honolulu police officer Sean Kaipu Nahina (Officer Nahina) testified first for the State. He remembered that on October 20, 1998, at around 5:15 p.m., he went to Kapiʻolani Medical Center for Women and Children on a sexual assault case. There, he met Complainant. Officer Nahina conducted a brief, preliminary interview of Complainant. She appeared shy and embarrassed.

Under cross-examination by Crawley's counsel, Officer Nahina maintained that, in his limited experience, it was not unheard of for a victim of a sexual assault not to cry or show emotion. Officer Nahina confirmed that Complainant did not report any physical injuries. Officer Nahina did not notice any. Complainant told Officer Nahina that the alleged assaults had taken place the night before at about 6:30 p.m. Under cross-examination by Swanson's counsel, Officer Nahina remembered that Complainant reported bathing three times since the alleged assaults.

Honolulu police officer James Rahe (Officer Rahe) testified that on October 23, 1998, at approximately 11:20 a.m., he assisted Detective Sunia in gathering evidence from the scene of the incident, room 402 of a hotel located at 450 Lewers Street. When they entered room 402, Officer Rahe noticed that the room was unoccupied and cleaned, the bed made. "Looks like a hotel room when you—when you first arrive there and the hotel's—and the room's been cleaned and all fixed up." Officer Rahe took photographs, diagramed the room and recovered evidence. He took tape lifts of hair and fiber evidence and the bedspread and blanket from the bed. He attempted to locate fingerprints but could not find any. At the close of direct examination, Officer Rahe described room 402 for the jury:

Okay. This is room 402. This is the entrance into room 402. As you walk in through the hall, the hallway area, this is the bathroom entrance on your left which leads into the bathroom. As you walk in further, this is where a night stand or a lamp and a telephone is, the bed. This is the wet bar area and you have another night stand here. There's a safe. And a chair.

On cross-examination, Officer Rahe admitted to Crawley's counsel that the hotel room had "very little evidentiary value" because it had been cleaned. Officer Rahe confirmed that his was the first police attempt to recover evidence in room 402. Officer Rahe agreed with Swanson's attorney that room 402 is a small room, and with the queen size bed in it, "practically any place that you

stand in the living area where that bed is, you're going to be pretty much close to the bed, . . . within just a couple of feet[.]"

Claire Chun (Chun), a criminalist with the Honolulu Police Department, testified as an expert witness "in the field of trace evidence analysis with respect to hair and fiber." Chun remembered that Detective Sunia

asked me to examine clothing from [the Complainant] and also to examine items recovered from a room, 12 items that were recovered, which included a bedspread, blanket and tape lifts of various areas of this room. And I was also asked if I did find hair on any of those items, to compare hair found with known hair samples from six different individuals.

Chun opined that one pubic hair found on the floor of the shower of the bathroom was consistent with the known pubic hair of Complainant. One hair from the bedspread was inconsistent with the known hair of five of the six comparison individuals but inconclusive as to the known hair of the sixth individual, Shabazz. Six or seven other hairs found in the room were inconclusive as to the known head hair of Complainant, and inconsistent with the known head hairs from the other five individuals. Another head hair found was inconclusive as to the known head hair of Crawley. Chun did not find any hair consistent with or inconclusive as to Swanson.

Detective Sunia met with Complainant on October 21, 1998. The alleged offenses had been reported to the police on October 20, 1998. Detective Sunia testified that she collected Complainant at Complainant's residence and transported her to the police station for the initial interview (described above). When Detective Sunia picked her up, Complainant gave Detective Sunia the clothing she had been wearing at the time of the incident—"her pants, her shirt, her underpanties and her bra."

Detective Sunia's investigation eventually yielded six suspects—Crawley, Shabazz, Swanson, Carvis, Shakespeare and Ugoezi. Detective Sunia provided a physical description of the first three:

For Mr. Crawley, his physical description was a black male with a gold tooth, approximately five-eight in height, a hundred and sixty pounds. Mr. Shabazz was also a black male, approximately six-one, a hundred and fifty pounds, with green eyes and light-colored dreads. Mr. Swanson was a fair-skinned black male, approximately six-three, hundred and eighty pounds.

Detective Sunia submitted the clothes she received from Complainant to the police evidence room and requested that they be tested for, *inter alia*, the presence of seminal fluid. Under cross-examination by Crawley's attorney, Detective Sunia confirmed that DNA testing detected seminal fluid on Complainant's panties. Thereupon, Detective Sunia obtained blood samples and hair from the six suspects and conducted DNA testing on those materials. When she received the results of the tests, Detective Sunia contacted Complainant again. Detective Sunia asked Complainant if she had engaged in sexual relations with anyone before the incident. Detective Sunia then had Complainant's boyfriend submit DNA for testing, which confirmed that he was the source of the seminal fluid.

Complainant testified that on October 19, 1998, she was living at Hale Kipa on Keʻeaumoku Street, an independent living program "that prepares children who have been foster kids all their lives to become adults." She had been living there for about seven months. She was to start business college classes on October 21, 1998. Complainant revealed that she had been in foster homes since she was four years old. At the time of trial, she was pregnant and had a two-year-old son who was placed in foster care.

On October 19, 1998, Complainant caught a bus to Waikiki and spent about three or four hours at the beach. She then took a bus to Ala Moana Shopping Center. She waited on the makai side of the shopping center for a transfer bus to take her to the Payless shoe store on the Ewa side of the shopping center, where she planned to buy some shoes.

After twenty to thirty minutes of waiting, Complainant decided instead to walk to the shoe store, which was only a few blocks

away. As she walked near the entrance to the mall, a car stopped in front of her. "I don't know if it was a town car but a pretty big car stopped in front of me." Complainant recognized the two men in the car from seeing them around Waikiki with their friends. She did not know them "personally." She knew them only by their nicknames, "Quick" and "T–Bone". In court, Complainant identified them as Crawley and Shabazz, respectively. Crawley, the driver, got out of the car and approached her. Crawley asked if she wanted to "kick it" with them. Complainant interpreted the invitation to mean that they would "[g]o on errands, maybe meet some other folks, guys and girls, and just hang out." She agreed to go with them and got in the back seat of the car.

First, the trio drove to Complainant's residence to get some clothes. She needed a change of clothes because she was "all salty and sticky and stuff from the beach" and was going to take a shower. But Complainant did not take a shower at her residence, because "Quick had stuff to do so I was going to go take it at the hotel." They took the clothes and left. Before arriving at the hotel, the three went to a beach and drove around town. As they rode, Complainant and Shabazz were "talking about school, stuff like that, mostly legal stuff and we also talked about lyrics and rap and just things like that." Complainant thought that they three "had a lot of the same interests." At one point, they stopped at a mini-mart "right on the outside of Waikiki[,]" where Crawley bought Coca–Cola and what Complainant later found out was Hennessey, "a type of hard liquor." Complainant also remembered that as they were driving around, Shabazz, and possibly Crawley, "smoked weed." Complainant denied partaking of the marijuana.

Shabazz, Crawley and Complainant eventually arrived at the Coconut Plaza Hotel on Lewers Street in Waikiki. Complainant thought that she would take a shower and then hang out with Crawley and Shabazz at the hotel. "[A]nd I thought they were gonna, like, have some other friends since everybody was talking on the phone and stuff." When they pulled up to the hotel, Complainant saw "this white girl and another black dude" get out of a taxicab. According to Complainant, "I had seen [the other man] around but I don't know who he was." Complainant recalled that the female handed the man some money and walked away. The man walked over to their car. Crawley got out of the car to talk to the man and went into the hotel with him. Complainant remembered that at this point, "I started to feel kind of nervous 'cause I didn't know who that other guy was." She told Shabazz that she was scared and asked Shabazz if he was going to stay. Shabazz told her, "Basically to be quiet." Eventually, Crawley and the other man reappeared. They told Complainant to get out of the car. The other man got into the car with Shabazz and they drove off down Lewers Street. Complainant went inside the hotel with Crawley.

Complainant and Crawley went to room 402. Complainant went into the bathroom to shower and put her change of clothes on the counter next to the sink. She closed the bathroom door and showered. She could not remember whether she had locked the bathroom door. When Complainant got out of the shower, part of her clean clothes was gone. Her bra and shirt were still there, but her pants and underwear were missing. She put on a towel, stuck her head out of the bathroom, and asked Crawley for the missing items of clothing, but he did not return them. Instead, he laughed at her. Complainant thought, "He was just trying to act silly." She did not think anything bad was going to happen.

Complainant went back into the bathroom. Before her shower, she had been wearing tennis shoes and a lavalava [8] and shirt over a bikini. She put the lavalava on over the towel. As for coverage, she explained, "Well, all of my body was covered but I had a . . . bra and a shirt on and then I had a towel and lava-lava on." She wore the bra and shirt up top and the towel and lavalava around her bottom. Complainant then left the bathroom and again asked Crawley for her pants and

---

8. A "lavalava" is a "rectangular cloth worn like a kilt or skirt by men, women, and children in Polynesia[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1279 (1981).

underwear. Crawley refused to return them. Complainant did not see the missing clothes anywhere in the hotel room. Complainant was still unafraid at this point. She did feel hot, because the air conditioning in the room was not working. Crawley called for assistance and someone later arrived to look at the air conditioner.

Frank Mamalias (Mamalias) responded to Crawley's call. Mamalias testified that when he arrived at room 402, the door was slightly ajar. A "lady's voice" called out that the door was open. There were two people in the room, a male and a female. The female was wearing only a lavalava, that "surround[ed] her body" and left her shoulders bare. As for the male, Mamalias remembered, "He's a black man and.... I believe he had his shirt off[.]" The repair, a simple knob adjustment, took less than a minute. Mamalias's impression of the couple was that "everything was all right." He saw no indication that alcohol was being consumed in Room 402.

When Mamalias was finished with the repair, Complainant asked him where she could get some ice. According to Mamalias, Complainant, still clad only in her lavalava, accompanied him into the elevator and rode with him up to the eighth floor where, at his direction, she got off to get the ice. That was the last time Mamalias saw Complainant. Mamalias stayed in the elevator and got off on the tenth floor to check on the hotel's boiler.

Complainant testified that she returned to room 402 with the ice. Crawley was drinking Hennessey and Coke. Complainant took only a sip of the liquor, because "I wanted to see what it tasted like but it was kind of too strong for me.... It taste like some really gross medicine." Complainant maintained that at this point, "I still had my T-shirt, bra, towel and lava-lava on." At some point, Complainant asked Crawley to call Shabazz and have him come back to the hotel room. She thought Shabazz was "pretty cool.... Because he was in the same major that I was gonna be in and he liked poetry. And I guess I thought it was interesting that I met somebody that I'd be going to ... the same school with[.]" Complainant asked Crawley

again for her pants because she "was feeling kind of silly." He did not give them back, so she went back into the bathroom and closed the door.

Complainant testified that at this point, events took a sinister turn:

[PROSECUTOR]: Okay. Why did you go into the bathroom and close the door?

[COMPLAINANT]: 'Cause I feel stupid.

[PROSECUTOR]: Why did you feel stupid?

[COMPLAINANT]: 'Cause I was standing there in a towel and lava-lava.

[PROSECUTOR]: Okay. And what were you thinking about when you went into the bathroom?

[COMPLAINANT]: Well, at that point I had started to get uncomfortable. I wasn't scared yet but I was uncomfortable.

[PROSECUTOR]: All right. Initially when he wouldn't give you back your clothes, what did you think about that?

[COMPLAINANT]: I got irritated.

[PROSECUTOR]: Okay. All right. So what happens after you go back into the bathroom and close the door?

[COMPLAINANT]: I just stood in there for a little while.

[PROSECUTOR]: All right. Do you know where Quick was while you were in there?

[COMPLAINANT]: He was in the room.

[PROSECUTOR]: Okay. Did you hear any sounds in the room?

[COMPLAINANT]: Yeah, I didn't know what it was.

[PROSECUTOR]: Okay. Did you ever come back out of the bathroom?

[COMPLAINANT]: Yeah.

[PROSECUTOR]: When you came out of the bathroom, what did you see?

[COMPLAINANT]: There was a bunch of different guys in the room.

[PROSECUTOR]: Okay. How many guys were in the room?

[COMPLAINANT]: Six.

[PROSECUTOR]: Okay. And what did they look like, just generally their description?

[COMPLAINANT]: Description.

[PROSECUTOR]: Well, were they male or female?

[COMPLAINANT]: Male.

[PROSECUTOR]: All right. And out of these six people, did you recognize any of them?

[COMPLAINANT]: Yes.

[PROSECUTOR]: Okay. Who did you see in the room?

[COMPLAINANT]: Quick, T–Bone and the guy who had came out of the cab.

[PROSECUTOR]: All right. What about the other three, had you ever seen those three around before?

[COMPLAINANT]: I seen them around Waikiki.

[PROSECUTOR]: Okay. Did you know them personally?

[COMPLAINANT]: No.

[PROSECUTOR]: Or their real names?

[COMPLAINANT]: No.

Complainant identified one of the other three men as Swanson. Complainant recalled that the six men were standing around in different places in the room. She remembered being next to the bed, then on the bed when Crawley, "like, bumped me." The other men were positioned around and near the bed, because the hotel room was small. Complainant said that the six men were taller and looked older than her. Most of them looked stronger than her. Complainant was sitting on the bed, with her back up against the headboard. She had moved into this position because she "felt intimidated. . . . 'Cause there were so many."

At this point, Complainant still had her lavalava and towel wrapped around her. Crawley, clad only in his boxer shorts, started pulling on her legs in an attempt to drag her into the middle of the bed. Complainant recounted that, "I was scared. . . . Because I knew that I had no control of the situation." It was not possible to physically overpower the men and escape. Complainant remembered talking about her boyfriend as Crawley was pulling on her legs:

[PROSECUTOR]: Okay. What did you say about your boyfriend?

[COMPLAINANT]: Basically that I didn't want him—I don't know what they was thinking of or whatever asking [Crawley] if he was gonna stop and—

[PROSECUTOR]: What did he say when you asked him if he was gonna stop?

[COMPLAINANT]: He said to quit fronting.

. . .

[PROSECUTOR]: What does the phrase "to quit fronting" mean?

[COMPLAINANT]: Like trying to act like you don't want it.

[PROSECUTOR]: Okay. Did you want to have any kind of sexual relations with him that day?

[COMPLAINANT]: No.

Crawley tried to get Complainant to perform oral sex on him: "By then he had already pulled me down so my back was on the bed and basically . . . . trying to pull my head towards his penis." Complainant tried to resist, but eventually Crawley succeeded. Complainant testified that Crawley's penis was in her mouth "[m]aybe two minutes or so, I don't know." Complainant claimed that the assaults continued:

[PROSECUTOR]: Okay. What happened after [Crawley] finished doing that? What's the next thing that he did?

[COMPLAINANT]: He put himself on me.

[PROSECUTOR]: Okay. And how did he put himself on you?

[COMPLAINANT]: He lay on me.

[PROSECUTOR]: He laid on you?

[COMPLAINANT]: Um-hum.

[PROSECUTOR]: Were you able to get away at that point?

[COMPLAINANT]: No.

[PROSECUTOR]: Were you saying anything to him?

[COMPLAINANT]: I basically asked him if he had any intentions of stopping.

[PROSECUTOR]: What did he say?

[COMPLAINANT]: No.

[PROSECUTOR]: Okay.

[COMPLAINANT]: And I guess he was still using that phrase, fronting, or whatever.

[PROSECUTOR]: Right. Did you ever tell him to stop?

[COMPLAINANT]: Yes.

[PROSECUTOR]: How many times did you tell him to stop?

[COMPLAINANT]: I don't know.

[PROSECUTOR]: More than once?

[COMPLAINANT]: Yes.

[PROSECUTOR]: More than twice?

[COMPLAINANT]: Yes.

[PROSECUTOR]: More than three times?

[COMPLAINANT]: I don't know.

[PROSECUTOR]: Okay. Did you say it loud enough for him to hear it?

[COMPLAINANT]: Yes.

[PROSECUTOR]: Did you say it like you meant it?

[COMPLAINANT]: Yes.

[PROSECUTOR]: What were the other five people in the room doing when Quick laid on top of you?

[COMPLAINANT]: Talking and passing condoms and stuff.

[PROSECUTOR]: Okay. Did all five of the guys get a condom?

[COMPLAINANT]: I don't know. I just know they were passing condoms.

[PROSECUTOR]: Okay. What were they saying?

. . .

[COMPLAINANT]: Trains, running trains.

[PROSECUTOR]: Running trains. What does that phrase mean?

[COMPLAINANT]: It means when a bunch of guys have sex with the same girl.

[PROSECUTOR]: Okay. How did you feel when they were making that kind of comment and passing condoms around?

[COMPLAINANT]: I was scared.

[PROSECUTOR]: Okay. Okay. What happens now when Quick is lying on top of you? What does he do?

[COMPLAINANT]: I know he tried sitting [(sic)] it in. I don't know what—he was trying to get it in. I remember I was wiggling or whatevers so, you know, he had stuck it in my butt and I kept wiggling and eventually he had got it in my vagina.

[PROSECUTOR]: Okay. Did he have a condom on?

[COMPLAINANT]: Yes.

[PROSECUTOR]: Okay. Did you give him permission to do what you just described?

[COMPLAINANT]: No.

[PROSECUTOR]: Did you want him to do it?

[COMPLAINANT]: No.

[PROSECUTOR]: Okay. Were you trying to resist when you were moving your body?

[COMPLAINANT]: Yes.

[PROSECUTOR]: Did he ejaculate?

[COMPLAINANT]: I don't know.

Complainant testified that when Crawley was finished, "I believe I jumped up.... Maybe on my knees or something." But Shabazz came at her from the back and pushed her down on her hands and knees. Holding her waist, Shabazz had intercourse with her. She had not given him permission to do so. She said she was crying loudly:

[PROSECUTOR]: Did you say anything to him [Shabazz] when he did that, did you tell him anything?

[COMPLAINANT]: Again I was basically hysterical. I remember shouting how can they do this stuff to females, they should be ashamed of themselves. I was just screaming a bunch of stuff. I don't remember everything that I said, but it was basically that.

[PROSECUTOR]: How did you feel physically, your physical body?

[COMPLAINANT]: I felt helpless.

. . .

[PROSECUTOR]: When T–Bone came from the back, what did Quick do?

[COMPLAINANT]: He grabbed my head and was trying to have me perform oral sex on him again.

[PROSECUTOR]: Was this while T–Bone was putting his penis in your vagina from the back?

[COMPLAINANT]: Um—hum.

Crawley did not succeed in forcing Complainant to perform oral sex on him again, because she kept her head down towards her chest. She remembered that during the assaults, Swanson "was basically saying, bitch, shut up." She was "screaming stuff," and it was "loud enough so that somebody from one of the rooms banged against the—the room[,]" making a "thump."

Shabazz let go of Complainant and she jumped up. She was still wearing her bra and shirt, but the towel and her lavalava had been removed by someone. She put on her underwear and pants, which she found "by the sink." She did not know how they had reappeared there. After Complainant got dressed, she "ran for the door." As she ran,

[t]he guy that was on the cell phone had told [the other men in the room] something like grab that bitch or something like that and two guys started chasing me. It isn't any of these [in the courtroom], not—none of them but two other guys had chased me. One had gotten me first and had tried to shut the door 'cause I had already opened it, but I had slammed the door against him and so he was stuck between the door and the wall, and then I had kept running towards the elevator. And then there was another one who had chased me and right where he got to me, the elevator doors had opened and there had been a tourist inside.

Complainant's pursuer got into the elevator with her, and when the elevator reached bottom, started walking after her. When they got outside of the hotel, he started shouting something, but Complainant ran ahead of him and could not make out what he said. Complainant ran for a couple of blocks, then caught a bus home. All told, Complainant had been in room 402 for "a few hours." Complainant remembered that when she arrived back at Hale Kipa, "I told the supervisor of my program that I had gotten raped but I wouldn't tell him anything else. I just

walked in my room." She tried to call her boyfriend but he was not home. She talked instead to his roommate—"told him, took a shower and went to sleep."

The next day, October 20, 1998, Complainant walked to Kapi'olani Medical Center to be examined. "My body, just to make sure, you know, I didn't—just in case—I was pretty sure I didn't catch anything 'cause I did see condoms on them but just be sure, I wanted to make sure I didn't have anything from them." Blood and hair samples were taken from her, as were various vaginal, rectal and oral DNA swabs. Complainant also made a police report about the incident.

While at Kapi'olani, Complainant told the doctors what had happened the day before. She could not tell them whether the men had ejaculated, because both men wore condoms, but she said that their movements during the acts of vaginal intercourse indicated to her that they had. Complainant answered in the negative when the doctors asked her whether any seminal fluid had spilled out of the condoms. She confirmed that there were two acts of vaginal sex and one act of oral sex. In addition: "I believe they–one of 'em, I don't think he was even trying but because I was moving, the tip of it went in [my anus]." Complainant also told the doctors that she had engaged in sex with her boyfriend the day before the October 19th incident. She denied having any sex after the incident. She informed them that she had bathed two or three times since the incident.

Under cross-examination by Crawley's counsel, Complainant admitted that it is possible she told Crawley that Shabazz had "pretty eyes[.]" She confirmed that she had been "kicking it" in Waikiki from the age of fourteen or fifteen. She remembered that she got back to Hale Kipa that night at about 8:00 or 8:30 p.m., well past the 7:00 p.m. curfew, a violation of house rules that warranted sanctions. Complainant could not explain how her boyfriend's semen came to be detected on the supposedly clean panties she took from her residence to the hotel. She adamantly denied that it was because she had engaged in sex with her boyfriend after the October 19th incident. Complainant did not think it unusual to go with men she had

never met before to take a shower in a hotel. She admitted she was offered marijuana that day but declined because she did not want to risk testing positive on a urine test, and not because she would not have enjoyed getting high with Crawley and Shabazz. She reiterated that she took only a sip of the Hennessey. She said, instead, "I prefer Jim Beam." She revealed that when Mamalias arrived at room 402 to fix the air conditioning, Crawley was wearing only boxer shorts. When Crawley's counsel attempted to clarify this revelation, Complainant stated, "I have—a lot of boys, I see them in their underwears. It's nothing. It's not like he was walking around butt naked." Complainant admitted that during the assaults, one or two of the other men in the hotel room went out on the lanai. She also told Crawley's counsel that when she ran out of the hotel room, she took with her the clothes she had worn to the beach that morning. They had been put into her purse. "Somebody just threw it in there." Complainant denied allegations by Crawley's counsel that she had consensual sex with Crawley in the hotel room—before she showered and the other men arrived. She acknowledged that she did not eat after 11:00 a.m. that day, but denied that the men drove her to Jack in the Box to eat that night and that they brought soft drinks back to the hotel room. She also denied that Crawley left the room for a period of hours, leaving her alone with Shabazz and the other men. She rejected allegations that she finally left room 402 because the men were calling her "a bitch" and other epithets during an argument she had with them over their musical abilities.

During his cross-examination, Shabazz's attorney established that Complainant spent almost five hours in the Coconut Plaza Hotel. Complainant entered the hotel at about 2:30 p.m. Her best guess was that Shabazz and the other men returned to the hotel around 5:00 p.m. Complainant left the hotel at "about 7:00, 7:15" p.m. Complainant detailed for Shabazz's counsel the conversation she had with Shabazz in the car after Crawley went into the hotel with the man from the taxicab. Complainant recalled that she and Shabazz talked about school. They also talked about rap music. Shabazz told Complainant that

he was "thinking of making some sort of a CD demo" of his rap music. Complainant suggested to Shabazz that she have input into the lyrics because she liked poetry. She felt they had "a lot of similar interests" and that Shabazz "was kind of an interesting guy[.]" Complainant also mentioned that when she started school on October 21, 1998, Shabazz was in one of her classes.

Dr. Parto Karimi (Dr. Karimi) testified as "an expert witness in the general area of medicine with a specialty in sexual-assault-type cases." She remembered that she examined Complainant on October 20, 1998, in the Sex Abuse Treatment Center at Kapi'olani Medical Center. Complainant had reported being sexually assaulted the day before.

During her physical examination of Complainant, Dr. Karimi did not find any evidence of physical injury, in the vaginal area or otherwise. She explained that in sexual assault cases, a lack of physical injury is "very common." Dr. Karimi also took samples for DNA analysis—blood samples, head and pubic hair samples, scrapings from under the nails, and swabbings from the mouth, the vagina and the anal area.

Complainant told Dr. Karimi that her assailants were wearing condoms and that no seminal fluid had spilled from the condoms. She also told Dr. Karimi that she had engaged in sex in the seventy-two hour period before the incident. Asked to assume that seminal fluid from Complainant's boyfriend was found on Complainant's underwear, Dr. Karimi explained that seminal "fluid can be lodged between the layers of the muscle on the higher level of the vagina, closer to the cervix and the uterus. And when the vagina is manipulated, that fluid can come down with gravity and be exposed to her underwear." Dr. Karimi opined that seminal fluid can remain in the vagina in this manner for "up to two days, let's say."

None of the three defendants put on a case, save for Crawley, who recalled Detective Sunia to the stand. On direct examination, Detective Sunia admitted that the synopsis of her closing report of her investigation contained the statement, "Upon exiting the bathroom, the males had taken

her clothing." On cross-examination by the prosecutor, Detective Sunia explained that Complainant had clarified that only one of the males, Crawley, took her clothing. Detective Sunia also acknowledged on direct examination that her closing report contained the statement, "They drove around for a while, and they went to the Coconut Plaza. She took a shower and was drinking with the males." On cross-examination, Detective Sunia maintained that Complainant had reported taking only a sip or a swig of the Hennessey, and denied that Complainant had made any statement about "drinking with the males." Detective Sunia had no recollection of Complainant telling her that Crawley was naked except for boxer shorts when Complainant emerged from the bathroom.

The prosecutor's closing argument included the following remarks:

> What about feelings of bias? You remember during opening statements one of the attorneys stood up here and he described the moment when that man got out the taxi, and he said that [Complainant] referred to him as a black dude. And the way it was set up here made it sound like [Complainaint] was making a very derogatory statement about that person maybe because of his race. The bottom line is [Complainant] has no bias against these people because of their race. Race has nothing to do with this case. In fact, as [Complainant] said, her son is half black; her boyfriend was black.

On March 10, 2000, the jury found Crawley guilty of the lesser included offense of sexual assault in the second degree on one count and guilty of the lesser included offense of attempted sexual assault in the second degree on another count. Crawley was acquitted on the other count charging attempted sexual assault in the first degree. The jury found Shabazz guilty of the lesser included offense of sexual assault in the second degree. Swanson was found not guilty on both counts of accomplice liability charged against him.

On March 21, 2000, Shabazz filed a motion, to set aside the verdict and enter a judgment of acquittal or, alternatively, grant a new trial. Shabazz argued that the court committed plain error in neglecting to engage him in an on-the-record colloquy regarding jury instructions on lesser included offenses, and in failing to instruct the jury "on the lesser-included offenses of sexual assault in the [third] degree, ... once the trial court decided to give instructions on the lesser-included offenses of sexual assault in the second & fourth degree and attempted sexual assault in the second & fourth degree[.]" Shabazz also averred that the court committed plain error in failing to instruct the jury on the definition of consent and on unanimity with respect to the issue of ineffective consent. Shabazz filed an essentially superseding motion for a new trial on the same day, citing, in addition, newly discovered evidence. On April 10, 2000, the court heard both motions and denied both.

On April 13, 2000, Crawley filed a motion for a new trial or, in the alternative, for a mistrial, which Shabazz later joined. The court heard Crawley's motion on May 2, 2000. The attorneys argued, and the court decided, as follows:

> [CRAWLEY'S COUNSEL]: ... [S]omething obviously occurred during this trial that has no place, not only in this courtroom, but no place anywhere in the country.
>
> Interestingly enough, in the *Rogan* case this Court revisited that very issue. I can't imagine, for the life of me, what relevancy there is to characterizing [Complainant] as being a local woman. I mean, I just can't imagine what value that has, other than the fact that female jurors in this case were local women. I cannot imagine what value there is evidentiary-wise and in opening statement to characterize the defendants as Afro–American. What is the difference? What is the possible difference in what their ethnic background is as it relates to [Complainant]. What does it matter if [Complainant's] boyfriend happened to be Afro–American or her children happened to be half Afro–American? Who cares?
>
> . . . .
>
> ... So I have no idea why [the prosecutor] did what he did. I have no idea why he

said what he said. But the logical conclusion—because it had no evidentiary value, it had no probative value. The only logical conclusion is that it was done to inflame the prejudices and passions of the jury. That is the only logical conclusion.

. . . .

THE COURT: [Attorney for Shabazz], do you have anything in addition to what [Crawley's counsel] has indicated?

[SHABAZZ'S COUNSEL]: No, Your Honor. We simply join with [Crawley's counsel's] statement.

. . . .

[PROSECUTOR]: The argument that they make that this is somehow racial, there is no basis for that. One time I referred to them as African–Americans. As I mentioned in my memo, I could have used all kinds of other phrases which the victim used. And I didn't feel comfortable using phrases like "the black dude." I just did not want to do that. Because I know those things, even though [Complainant] said it, might be repeated during testimony and would be improper.

. . . .

This case comes nowhere near the comment made in *Rogan*. *Rogan*, I would acknowledge, was extremely inappropriate. The reason why is there was no evidence that it was every mother's nightmare to find this situation. The victim's mother in that case did testify. She did not say that it was her nightmare. So there was no evidence; whereas, in our case there is a lot of evidence.

. . . .

THE COURT: What the Court has to look at in determining whether there is some evidence to support a finding that there was prosecutorial misconduct that arose to the level that warrants a new trial in this case, the focus is on defense's argument that the prosecuting attorney's opening statement was an appeal to racial prejudice.

Now, one of the things we did do in the course of that opening statement—at that point no evidence had been presented—there was an objection by [Crawley's coun-

sel]. The record at that point supported an actual finding there was an appeal to racial prejudice in opening remarks.

I did admonish counsel that if the opening statement continued in that vein one could reasonably find that there was then at that point an appeal to racial prejudice. At that point I did instruct [the prosecutor] outside the presence of the jury, here at the bench, to refrain from those comments, which he did, in the remainder of his opening statement.

[Crawley's counsel], to his credit, brought that objection fairly early so that there were no continued references that would make that kind of appeal. This Court is particularly sensitive to those kinds of appeals, as well. It is aware, as well, of the Supreme Court's finding in *Rogan*.

This is not a *Rogan* situation. I don't think the conduct in this case rose to that level.

On June 14, 2000, the court filed its written order denying Crawley's motion for a new trial or, in the alternative, for a mistrial. The court found "insufficient evidence in the record to support a finding of prosecutorial misconduct." Moreover, the court found that "the prosecutor's closing argument was within the bounds of legitimate argument." The court also found "that the facts in this case are distinguishable [from that in *Rogan* ] and that the prosecutor's remarks in this case do not rise to the level [of] prosecutorial misconduct."

Shabazz filed a notice of appeal (No. 23571). Crawley filed two notices of appeal (No. 23479 and No. 23575), which were consolidated into his present appeal (No. 23575).

## II. Discussion.

### A. *Prosecutorial Misconduct.*

On appeal, Shabazz and Crawley contend the court abused its discretion when it failed to declare a mistrial because of prosecutorial misconduct. Crawley argues that "[t]he State aroused racial prejudice in opening arguments [ (sic) ] by invoking the racial and ethnic differences and differences in localities of origin between [Complainant and Defen-

dants]." Similarly, Shabazz avers that "despite the [prosecutor's] protestations that this was merely what the evidence would show, such comments conjured up the type of racial stereotyping clearly designed to incite the jury against the defendants." Shabazz further asserts that the "only reasonable inference that can be drawn from the racially based contrast employed by the prosecutor in this case, is that the contract [ (sic) ] was intended to draw an 'us versus them' distinction, to appeal to the jury's passions or prejudices." Crawley also complains that the prosecutor's affirmation, in his closing argument, that "[r]ace has nothing to do with this case[,]" "only served to again arouse prejudices stirred by the initial remarks."

In *Rogan, supra*, Rogan was charged with three counts of unlawful sexual penetration and five counts of unlawful sexual contact. The twelve-year-old complaining witness testified that she summoned the twenty-two-year-old Rogan to her family's home at a time when her mother and stepfather were absent. Then and there, she alleged, Rogan subjected her to various acts of sexual contact and penetration. The tryst was abruptly interrupted by the return home of the complaining witness's mother.

Rogan's testimony essentially paralleled that of the complaining witness, except for his denial that any sexual contact or penetration took place. Rogan allowed that dancing, kissing and some partial disrobing took place, but maintained that the complaining witness refused to go further. *Rogan*, 91 Hawai'i at 409–11, 984 P.2d at 1235–37.

During his rebuttal argument, the prosecutor in *Rogan* told the jury:

> There was one thing [that defense counsel mentioned] about, you know, it was the parents who wanted the conviction and somehow [the complaining witness] was coached. Yeah, you can bet the parents wanted a conviction. *This is every mother's nightmare. Leave your daughter for an hour and a half, and you walk back in, and here's some black, military guy on top of your daughter.* That's what she's saying. . . .

*Id.* at 412, 984 P.2d at 1238 (emphasis and ellipsis in the original; internal block quote

format omitted). Rogan's counsel immediately objected to these comments, and after the jury was sent to deliberate, moved for a mistrial. The circuit court overruled the objection and denied the motion. The jury convicted Rogan of four counts of unlawful sexual contact, either as charged or as lesser included offenses. *Id.* at 411, 984 P.2d at 1237.

On Rogan's appeal of the denial of his motion for mistrial based on prosecutorial misconduct, the Hawai'i Supreme Court mentioned the abuse-of-discretion standard of review generally applicable to a trial court's denial of a motion for mistrial:

> The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

*Id.* (citations and internal quotation marks omitted). The supreme court also laid out the analytical framework applicable to any question of prosecutorial misconduct:

> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. Misconduct of a prosecutor may provide grounds for a new trial if there is a reasonable possibility that the misconduct complained of might have contributed to the conviction.

*Id.* at 412, 984 P.2d at 1238 (citations and internal quotation marks and block quote format omitted).

The United States Supreme Court has noted that "[t]he [United States] Constitution prohibits racially biased prosecutorial arguments[,]" *McCleskey v. Kemp*, 481 U.S. 279, 310 n. 30, 107 S.Ct. 1756, 95 L.Ed.2d 262

**376**

(1987) (citation omitted), and held that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (in the context of race discrimination in the selection of a grand jury). Moreover, "[c]oncern about fairness should be especially acute where a prosecutor's argument appeals to race prejudice in the context of a sexual crime, for few forms of prejudice are so virulent." *Miller v. North Carolina,* 583 F.2d 701, 707 (4th Cir.1978).

And so, addressing the nature of the prosecutor's conduct in *Rogan,* the Hawai'i Supreme Court declared that

> arguments by the prosecution contrived to stimulate racial prejudice represent a brazen attempt to subvert a criminal defendant's right to trial by an impartial jury as guaranteed by both the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. Such arguments foster jury bias through racial stereotypes and group predilections, thereby promoting an atmosphere that is inimical to the consideration of the evidence adduced at trial. Moreover, such an appeal to racial prejudice threatens our multicultural society and constitutional values. We must therefore recognize that "[o]ur government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

*Rogan,* 91 Hawai'i at 414–15, 984 P.2d at 1240–41. Following *McCleskey* and numerous, like-minded "courts throughout the country[,]" the *Rogan* court set forth principles specifically applicable to "appeals to racial prejudice during closing argument[.]" *Rogan,* 91 Hawai'i at 413–14, 984 P.2d at 1239–40.

> *Arguments that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated.* Of course, the mere mention of the status of the accused as shown by the record may not be im-

proper if it has a legitimate bearing on some issue in the case, such as identification by race. But where the jury's predisposition against some particular segment of society is exploited to stigmatize the accused or the other witnesses, such argument clearly trespasses the bounds of reasonable inference of [ (sic) ] fair comment on the evidence. Accordingly, many courts have denounced such appeals to prejudice as inconsistent with the requirement that the defendant be judged solely on the evidence.

*Id.* at 413, 984 P.2d at 1239 (internal block quote format omitted; emphasis in *Rogan* ) (quoting 1979 Commentary to ABA Prosecution Function Standard 3–5.8(c) (3d ed. 1993)).

On the record before it, the *Rogan* court reasoned as follows:

> In this case, the deputy prosecutor's reference to Rogan as a "black, military guy" was clearly inflammatory inasmuch as it raised the issue of and cast attention to Rogan's race. Because there was no dispute as to the identity of the perpetrator in this case, Rogan's race was not a legitimate area of inquiry inasmuch as race was irrelevant to the determination of whether Rogan committed the acts charged. The prosecution concedes that the deputy prosecutor's comment was "ill-advised." Indeed, the deputy prosecutor's comment had the potential of distracting the jury from considering only the evidence presented at trial. It is therefore inescapable that the deputy prosecutor's reference to Rogan as a "black, military guy" was an improper emotional appeal that could foreseeably have inflamed the jury.

> The deputy prosecutor's inflammatory reference to Rogan's race was further compounded by the statement that the incident was "every mother's nightmare," which was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position. Like the deputy prosecutor's reference to Rogan's race, the "every mother's nightmare" comment was not relevant for pur-

poses of considering whether Rogan committed the acts charged.

*Id.* at 414, 984 P.2d at 1240. In conclusion, the *Rogan* court held that

> appeals to racial prejudice lack the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i and will not be tolerated. For this reason, we further hold that references to race that do not have an objectively legitimate purpose constitute a particularly egregious form of prosecutorial misconduct.

*Id.* at 415, 984 P.2d at 1241. *But see State v. Corpuz*, 3 Haw.App. 206, 212, 646 P.2d 976, 981 (1982) ("Examination of the trial jury list indicates the jury to have consisted of persons of various racial extractions. It is well known in this jurisdiction that references to racial extraction for purposes of description are commonplace. Those members of the jury who have resided here for any length of time can be presumed to be familiar with that practice. There is nothing to indicate that any member of the jury had his or her prejudice aroused by the racial references.")

Thus concluding that Rogan's prosecutor had committed prosecutorial conduct, and noting the lack of a specific, curative instruction and the absence of overwhelming evidence against Rogan, the supreme court set aside Rogan's convictions. *Id.* at 414–16, 984 P.2d at 1240–42.

■ In our case, the allegedly improper opening statement began, "Good afternoon, ladies and gentlemen. This case is going to be about an attempt to *gang rape* a *young local woman.*" (Emphases added.) The prosecutor went on to refer to Complainant as a "young local woman" no less than four times during the first few paragraphs of his opening statement. One of those times, the prosecutor felt it necessary to spell it out: "She's a young local woman born and raised here in Hawai'i." After this clear and repeated characterization of Complainant as "a young local woman[,]" the prosecutor told the jury, later on in his opening statement, that Complainant felt "vulnerable, half-naked, and basically outnumbered" when she was surrounded by "*six African–American males*[.]" (Emphasis added.)

■ In considering, first, the nature of the conduct, *Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238, we recognize that

> the mere mention of the status of the accused as shown by the record may not be improper if it has a legitimate bearing on some issue in the case, such as identification by race.

*Id.* at 413, 984 P.2d at 1239 (internal block quote format omitted). However, in this case, the reference to the race of the Defendants, and to Complainant's "local" origin as a code word for race, had, as in *Rogan*, no "legitimate bearing on some issue in the case, such as identification by race." *Id.* (internal block quote format omitted).

The identification of the Defendants as "six African–American males" did not, for example, bolster an eyewitness identification. To the contrary, identification was not at issue here because Crawley and Shabazz never contested the issue of identification. They raised consent as a defense instead. The State did not below, and does not on appeal, advance any legitimate explanation of the relevance of the racial references. Hence, under the holding of *Rogan*, the references to race in this case, "that [did] not have an objectively legitimate purpose[,] constitute a particularly egregious form of prosecutorial misconduct." *Id.* at 415, 984 P.2d at 1241.

If the prosecutor's remarks in this case were viewed out of textual and historical context, it might be argued that they were merely referential and therefore innocuous, and in any event not as inflammatory as those in *Rogan*.

It should be remembered, however, that in *Rogan*, the mere irrelevant reference to Rogan as a "black, military guy"—which, taken by itself and out of all context, is colorably more referential than invidious—"was an improper emotional appeal that could foreseeably have inflamed the jury." *Id.* at 414, 984 P.2d at 1240. The further reference to "every mother's nightmare"—inflammatory without question—only "further compounded" the prosecutorial misconduct by "evok[ing] sympathy for the Complainant's mother and represent[ing] an implied invita-

tion to the jury to put themselves in her position." *Id.*

Even assuming, *arguendo*, that the discrete references to race in this case were not derogatory and that this circumstance could make a difference in the law, the designations were inert elements which, when mixed together, became nonetheless volatile. The prosecutor's repeated references to Complainant as a "young local woman[,]" when juxtaposed with his identification of the Defendants as "African–American males[,]" and coupled with his description of the incident as a "gang rape[,]" threatened to disinter some of our most vicious passions and prejudices. These invidiously divisive herd instincts may now be officially and socially *verboten*, but *sub rosa* they remain intractably insidious.

▪ In any event, it is clear that irrelevant prosecutorial references to race need not be derogatory to be misconduct. *See, e.g., McFarland v. Smith*, 611 F.2d 414, 417 (2d Cir.1979) ("To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended."); *Weddington v. State*, 545 A.2d 607, 614 (Del.1988) (quoting *McFarland, supra*).

▪ Nor is it an answer to dismiss the racial references as trivial, isolated and evanescent: "We reject outright the Government's claim that the prosecutor's remarks were fleeting and insignificant. Even if brief, use of race as a factor in closing argument is improper[.]" *United States v. Doe*, 903 F.2d 16, 26 (D.C.Cir.1990) (footnotes, internal quotation marks and original brackets omitted). "[W]e have engaged in unceasing efforts to eradicate racial prejudice from our criminal justice system.... It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case." *Id.* at 21 (footnotes and internal quotations marks and block quote format omitted).

We acknowledge that the *Rogan* court addressed impermissible racial references in the prosecutor's rebuttal argument, while those in this case occurred during the prosecutor's opening statement. And we concede the grain of truth encapsulated in the ancient aphorism: "'If you want to excite prejudice you must do so at the close, so that the jurors may more easily remember what you said.'" *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 642 (2d Cir.1946) (Frank, ·J., dissenting) (quoting Aristotle, *Rhetoric*, Bk. III, Ch. 14).

But generally, "[t]he evils of racial prejudice lurk too frequently throughout the administration of criminal justice. They must be condemned whenever they appear." *McFarland*, 611 F.2d at 419. And the Hawai'i Supreme Court has opined upon allegedly improper prosecutorial remarks during opening statements, *State v. Valdivia*, 95 Hawai'i 465, 479–80, 24 P.3d 661, 675–76 (2001) (addressing improper, nonracial prosecutorial remarks in opening statement), as has this court. *Corpuz*, 3 Haw.App. at 210–12, 646 P.2d at 979–81 (addressing prosecutorial references to race in opening statement). *See also State v. Klinge*, 92 Hawai'i 577, 590–91, 994 P.2d 509, 522–23 (2000) (addressing remarks the prosecutor made during *voir dire* ).

▪ In the end, we conclude that, *ceteris paribus*, it matters little where and when in the trial improper prosecutorial appeals to race prejudice occur. While such remarks in closing arguments may be fresher and more memorable to a deliberating jury, those made in opening statements can be an infusion that imbrues and imbues the entire course.

It appears, then, that *Rogan* is, in principle, on all fours with this case with respect to the first *Rogan* factor, "the nature of the [prosecutor's] conduct." *Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238. The State would have it otherwise, but we cannot oblige.

▪ In response to the oral motion for mistrial, the prosecutor rationalized his choice of words, as follows:

Well, your honor, I think the evidence will show that she was a young local woman, 17. The jury will obviously see that she is local, born and raised here in Ha-

wai'i, so that's what the evidence is going to show.

As far as the defendants, the evidence will show that as well.

But highlighting racial differences, just because "the evidence will show that[,]" lacks legitimate justification in the complete absence of relevance to the proof at trial. *Id.* at 414, 984 P.2d at 1240. That argument could be made for any racial reference, and any number of such references in a trial. The argument is merely a variant of the discredited notion that such remarks in a jury trial can be, *prima facie,* merely referential, and therefore innocuous or trivial.[9]

■ On appeal, the State argues that [a]t the outset, the defense did not seek by way of a motion in limine prior to trial to preclude [Complainant] from referring to either the defendants or people with whom they associated in racial terms. Moreover, during the investigation of the instant matter, [Complainant] made statements to the authorities during which she referred to the defendants and people with whom they associated as "black dude[s]" on a number of occasions. Rather than use the term "black dude[s]", the deputy prosecutor in his opening statement chose the less racially charged and more racially sensitive term "Afro–Americans" [ (sic) ] when referring to the testimony the jury could expect to hear regarding Complainant's description of the defendants and the other people.

To this argument, Shabazz replies, "More racially sensitive than what? It would undercut the policy against countenancing the use of unnecessary and inflammatory racial distinctions by counsel to require that they be expressed in obscene or vulgar terms before the misconduct can be grounds for reversal." (Internal quotation marks omitted.) In light of *Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241, we agree with Shabazz. The fact that the prosecutor chose a "less racially charged" and "more racially sensitive" designation for Defendants does not vitiate the material circumstance—that the racial references had absolutely no relevance to the proof at trial.

To the extent the State seeks to excuse the prosecutor's remarks by way of Complainant's testimonial references to "black dudes," we would remind the State that the prosecutor is held to a different standard of conduct. "This court has repeatedly noted that the prosecution has a duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused. The American Bar Association (ABA) Prosecution Function Standard 3-1.2(c) (3d ed. 1993) states that the duty of the prosecutor is to seek justice, not merely to convict." *Rogan,* 91 Hawai'i at 412, 984 P.2d at 1238 (brackets, citations and internal quotation marks omitted). Moreover, "[p]rosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office." *Id.* at 413, 984 P.2d at 1239 (internal block quote format omitted) (quoting ABA Prosecution

---

**9.** We note and reject the following argument, made by the prosecutor at the hearing on the post-trial motion for mistrial, attempting to distinguish this case from *State v. Rogan,* 91 Hawai'i 405, 984 P.2d 1231 (1999):

This case comes nowhere near the comment made in *Rogan. Rogan,* I would acknowledge, was extremely inappropriate. The reason why is there was no evidence that it was every mother's nightmare to find this situation. The victim's mother in that case did testify. She did not say that was her nightmare. So there was no evidence; whereas, in our case there is a lot of evidence.

Again, this is another mere variant of the empty argument that irrelevant racial designations are unexceptionable where they are, *prima facie,* merely referential and innocuous. *Id.* at 415, 984 P.2d at 1241 ("references to race that do not have an objectively legitimate purpose constitute a particularly egregious form of prosecutorial misconduct"). In addition, the prosecutor's characterization of the rationale in *Rogan* is erroneous. The "every mother's nightmare" remark was condemned, not because of a lack of evidence that the incident shocked the complaining witness's mother, but because it "was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position." *Id.* at 414, 984 P.2d at 1240.

Function Standard 3–5.8(a) (1993)).[10]

The State also contends "the deputy prosecutor made clear that the trial was not about race[.]" The State is referring to the following remarks made by the prosecutor during his closing arguments:

> What about feelings of bias? You remember during opening statements one of the attorneys stood up here and he described the moment when that man got out the taxi, and he said that [Complainant] referred to him as a black dude. And the way it was set up here made it sound like [Complainaint] was making a very derogatory statement about that person maybe because of his race. The bottom line is [Complainant] has no bias against these people because of their race. Race has nothing to do with this case. In fact, as [Complainant] said, her son is half black; her boyfriend was black.

If the State is offering these remarks as a cure for the prosecutor's earlier references to race, we cannot accept. The remarks may not have even been a palliative. Crawley offers the possibility that, "While the prosecution stated in closing remarks to the jury that 'Race has nothing to do with this case', such mere mention only served to again arouse prejudices stirred by the initial remarks."

At any rate, we question the apparent need to draw attention to race during closing arguments if, as the prosecutor averred, it really "had nothing to do with this case." And the argument that Complainant was free of racial bias because "her son is half black; her boyfriend was black[,]" really deserves no comment. Insofar as the argument could

in any way be considered a legitimate attempt to bolster the Complainant's credibility, it was to that extent permissible under *Rogan*. It could not, however, account for, nor excuse or mitigate in any wise, the prosecutor's remarks in opening statement.

In a more pertinent argument, the State attempts to supply the "legitimate bearing on some issue in the case," required by *Rogan* for permissible remarks about race. *Rogan*, 91 Hawai'i at 413, 984 P.2d at 1239. The State asserts that the prosecutor's references to Complainant as a "young local woman" were relevant to counter the suggestion, raised by the defense, that "[Complainant] was mature beyond her years and knew exactly that which was going to happen inside the room and thus, was a willing participant." This contention is all well and good, as far as it goes. But it begs the question, why a simple reference to "young woman" would not have sufficiently served the purpose, without the volatile reference to "local?"

Turning to the second *Rogan* factor, *id.* at 412, 984 P.2d at 1238 ("the promptness of a curative instruction"), we learn that "a prosecutor's improper remarks are generally considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." *Id.* 415, 984 P.2d at 1241 (citations, brackets and internal quotation marks omitted). In *Rogan*, "no curative instruction was given after the inflammatory comments were made. Indeed, not only was there no curative instruction given to address the inflammatory comments, but the circuit court overruled defense counsel's timely objection." The *Rogan* court thereupon concluded that the second factor weighed "heavi-

---

**10.** We question why the prosecutor did not walk on eggshells at trial when it came to the subject of race, for at virtually every pretrial hearing and event in this case, the issue of race was hotly contested. For example, in a hearing regarding subpoenas, the following dialogue occurred:

> [CARVIS'S COUNSEL]:.... We know that the defendants are part of the Abyss group, a rap group; that the rap group has been specifically, based on information that I have, have been targeted by [the Honolulu Police Department]....
>
> ....
>
> According to one of the detectives who assisted in extraditing [Carvis] back from Las

Vegas, he was told there's an inter-agency task force targeting them.

> THE COURT: Targeting the defendants and their group for racial purposes?
>
> [CARVIS'S COUNSEL]: No one's going to say just for racial purposes. No one ever says that, Your Honor .... it's very rare that someone comes out and says we are prosecuting these people because of the color of their skin.
>
> ....
>
> Why these six men? Because these six men have all been previously identified as members, through the gang detail investigation at [the Criminal Intelligence Unit], as members of an alleged gang.

ly in favor of Rogan inasmuch as no curative instruction was given." *Id.*

As in *Rogan,* the court below denied Defendants' objection to the prosecutor's opening remarks. The court then failed to give any curative instruction, even though it apparently recognized the improper racial implications of the remarks:

> Well, that's kind of—so if we're making reference over and over again, it could be perceived as being—someone could see that that's being a ploy to appeal to that. I mean, obviously when they see her and they see the defendants, they're what they are, so I think we need to refrain from that kind of argument at this point.
>
> . . . .
>
> We're not going to hear any more argument until closing. Certainly in closing argument, I don't think we're going to hear that approach that way.

Although the State points out that the court gave certain standard jury instructions immediately before the opening statements— "[t]he opening statement is not evidence but it's simply designed to assist you in receiving and evaluating the evidence that you will see and hear in this case"—and at the end of the trial—"what [the attorneys are] going to be saying in their closing arguments is not evidence . . . . [y]ou're not bound by their interpretations or by their recollection of the evidence"—, we remember that the *Rogan* court expressly rejected the notion that general advisements given to the jury before deliberations could adequately cure the effect of an improper racial remark. On this point, the supreme court reasoned,

> Although the circuit court instructed the jury prior to its deliberations that "statements or remarks made by counsel are not evidence" and that "you must not be influenced . . . by passion or prejudice against the defendant," it is unlikely that the circuit court's general instructions that were delivered well after the inflammatory comments along with the other general jury instructions could have negated the prejudicial effect of the deputy prosecutor's comments.

*Id.* at 415, 984 P.2d at 1241 (brackets and citation omitted). *But see Valdivia,* 95 Hawai'i at 479–81, 24 P.3d at 675–77 (although no specific curative instruction was given with respect to improper (but not racial) remarks made by the prosecutor during his opening statement, general instructions given by the court can weigh the second *Rogan* factor in favor of the State). Granted that, in contradistinction to the dilatory general instructions given in *Rogan,* the court below instructed the jury immediately before opening statements that the statements were not to be considered evidence. But the problem with the prosecutor's remarks was not that the jury may have considered them to be evidence, but that they resonated inflammatory intonations. In sum, we conclude that the second *Rogan* factor clearly weighs heavily in favor of Crawley and Shabazz.

The third *Rogan* factor, *id.* at 412, 984 P.2d at 1238 ("the strength or weaknesses of the evidence against the defendant"), also weighs in favor of Crawley and Shabazz. In weighing this factor, the *Rogan* court observed that

> this case essentially turned on the credibility of two witnesses—the Complainant and Rogan. There were no independent eyewitnesses or conclusive forensic evidence in this case. Instead, the prosecution's case against Rogan depended heavily on the Complainant's testimony. Given that Rogan denied having committed any of the acts for which he was charged, this case was based on the Complainant's version of the events against Rogan's version. Under these circumstances, we cannot say that the evidence of criminal conduct against Rogan was overwhelming.

*Id.* at 415, 984 P.2d at 1241 (footnote omitted).

Analogously, the evidence against Crawley and Shabazz consisted, in the main, of the testimony of Complainaint. There were no independent eyewitnesses clearly favoring the State. The cleaned hotel room yielded scant evidence. The results of forensic testing were neither here nor there. Crawley and Shabazz wore condoms, and Complainant's underwear contained the semen of her boyfriend. However, unlike Rogan, the Defendants in this case chose not to testify.

But then again, that was their right. So the State's case nonetheless remained, in essence, Complainant's credibility. Extensive and intensive cross-examination yielded numerous odd notes in Complainant's testimony and the other evidence presented by the State. Hence, like the supreme court in *Rogan*, we cannot conclude "that the case against [Crawley and Shabazz], which hinged on the credibility of the Complainant, was so overwhelming as to outweigh the inflammatory effect of the deputy prosecutor's comments." *Id.*

After weighing the three *Rogan* factors, we discern a distinct and reasonable possibility that the prosecutor's references to race might have contributed to the convictions of Crawley and Shabazz. "The virus thus implanted in the minds of the jury is not so easily extracted." *Antonelli Fireworks*, 155 F.2d at 655 (Frank, J., dissenting) (citation, footnote and internal quotation marks omitted). Their convictions must therefore be set aside. *Rogan*, 91 Hawai'i at 416, 984 P.2d at 1242.[11]

The remaining question in this connection is whether the double jeopardy clause of the Hawai'i Constitution bars reprosecution of Crawley and Shabazz. *Id.* On this issue, the *Rogan* court held as follows:

Accordingly, we hold, under the double jeopardy clause of article I, section 10 of the Hawai'i Constitution, that reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that,

from an objective standpoint, it clearly denied a defendant his or her right to a fair trial. In other words, we hold that reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial.

*Id.* at 423, 984 P.2d at 1249 (footnotes omitted). The supreme court noted and emphasized, however, that

the standard adopted for purposes of determining whether double jeopardy principles bar a retrial caused by prosecutorial misconduct requires a much higher standard than that used to determine whether a defendant is entitled to a new trial as a result of prosecutorial misconduct. Double jeopardy principles will bar reprosecution that is caused by prosecutorial misconduct only where there is a highly prejudicial error affecting a defendant's right to a fair trial and will be applied only in exceptional circumstances such as the instant case. By contrast, prosecutorial misconduct will entitle the defendant to a *new trial* where there is a reasonable possibility that the error complained of might have contributed to the conviction (*i.e.*, the error was not "harmless beyond a reasonable doubt").

*Id.* at 423 n. 11, 984 P.2d at 1249 n. 11 (italics in the original; citation omitted). Accordingly, the *Rogan* court held that the double jeopardy clause barred reprosecution of Rogan because the prosecutor's remark in closing argument "was so egregious, from an objective standpoint, that the inference is inescapable that the remark clearly denied

---

11. We feel we must draw attention to the following argument made by the State on appeal: "Additionally, the ethnicity and gender of the judge leaves no reason to doubt the judge's assertion that she was 'particularly sensitive' to such issues and made the judge well-qualified to determine whether the statements were racially prejudiced or improper." Crawley responds,

At page 33 of the Answering Brief, the State suggests that the "ethnicity and gender" of the trial judge ensured the judge's "qualifications" to assess the propriety of the subject remarks. The implication that the trial judge would bring added sensitivity or insight to bear on the instant matter, as opposed to situations involving non-African-Americans, is ultimately racist.

We agree with Crawley and find no merit in the State's reasoning. We note that other courts have similarly rejected such sophistry. The United States Court of Appeals for the Second Circuit held constitutionally impermissible a prosecutor's suggestion to the jury that a black police officer was more likely to testify truthfully against a member of her own race. The court held that the argument "invokes race for a purpose that is either illogical or of very slight and uncertain logical validity[.]" *McFarland v. Smith*, 611 F.2d 414, 419 (2d Cir.1979). *See also People v. Hearns*, 18 A.D.2d 922, 238 N.Y.S.2d 173, 174–75 (N.Y.App.Div.1963) ("The vice of such an argument is not only that it is predicated on a false and illogical premise, but more important it is divisive[.]").

Rogan his right to a fair trial." *Id.* at 424, 984 P.2d at 1250.

We do not believe, however, that ours is the exceptional circumstance in which the prosecutorial misconduct rose to that pinnacle of egregiousness that bars reprosecution. The indicated disposition is therefore to vacate and remand, rather than reverse.[12]

### B. Sufficiency of the Evidence.

 In light of the indicated disposition of this case, we need only decide one other issue on appeal—whether there was sufficient evidence to support the convictions of Crawley and Shabazz. *State v. Malufau,* 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995). Taking the evidence in the light most favorable to the State, and fully respecting the province of the jury to determine the credibility of witnesses and the weight of evidence, we easily conclude there was substantial evidence to support the convictions.[13] We therefore vacate the May 9, 2000 judgments of conviction and sentence against Crawley and Shabazz, and remand for a new trial, free of racial undertones.

### III. Considerations On Remand.

We briefly address other issues raised in these appeals, for the consideration of the court on remand.

### A. Court Advisements Regarding the Constitutional Right to Testify.

Both Crawley and Shabazz complain that the trial court's "*Tachibana* colloquy" was insufficient to ensure a knowing and voluntary waiver of their right to testify. *See Tachibana v. State,* 79 Hawai'i 226, 900 P.2d 1293 (1995).

Before jury selection started, the court gave the following pretrial advisement:

THE COURT: ... The jury is waiting outside. I called in defense counsel and counsel in early so the Court can take up the *Tachibana.* I take it, counsel, you have explained to your respective clients of course responsibility with regard to *State* versus *Tachibana;* is that correct, [attorneys for the three Defendants]?

[SHABAZZ'S COUNSEL]: Yes.

THE COURT: And so each of you, Mr. Crawley, Mr. Shabazz and Mr. Swanson, the Court has an obligation to inform you of the following: that you have the constitutional right to testify in your own defense. You certainly ought to consult with your respective counsel regarding that decision. However, it is your decision and no one can prevent you from testifying if you choose to do so.

If you decide to testify on your own behalf, then of course the prosecutor will be entitled to cross-examine you. You also have the right not to testify and to remain silent throughout these proceedings, and if you choose not to testify, I will instruct the jury that it cannot hold your silence against you in deciding this case.

If, by the end of the trial—end of the trial proceedings you decided not to testify, I'll come back and just make certain on

---

12. Hawai'i Rules of Appellate Procedure Rule 35(e) (2001) explains: "When used in an opinion or other dispositional order, the word 'reverse' ends litigation on the merits, and the phrase 'vacate and remand' indicates the litigation continues in the court or agency in accordance with the appellate court's instruction."

13. The test on appeal for a claim of insufficient evidence is "whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Ildefonso,* 72 Haw. 573, 576, 827 P.2d 648, 651 (1992) (citations omitted). *See also State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *Ildefonso,*

72 Haw. at 577, 827 P.2d at 651 (citation, internal quotations marks and ellipsis omitted). "The jury, as the trier of fact, is the sole judge of the credibility of witnesses or the weight of the evidence." *Tamura,* 63 Haw. at 637–38, 633 P.2d at 1117 (citations omitted). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Tsugawa v. Reinartz,* 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974) (citation and internal quotation marks omitted). "It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction." *Ildefonso,* 72 Haw. at 576–77, 827 P.2d at 651 (citation and internal quotation marks omitted).

the record that the decision not to testify was indeed your decision.

Okay. Anything else that we need to take up before the jury comes in? I think we've covered just about everything.

The court did not expressly confirm on the record that Defendants understood the court's pretrial advisement. Immediately after the close of all evidence, the following colloquy occurred:

THE COURT:.... Okay. And anything else that we need to address other than closing argument?....

[PROSECUTOR]: Is Your Honor going to do the *Tachibana* at this time?

THE COURT: Oh, I'm sorry. Thank you.

Thank you very much, [Mr. Prosecutor].

All of the Defendants' cases have been completed; and in this case, Mr. Crawley has elected not to testify.

Mr. Crawley, was that your decision not to testify?

MR. CRAWLEY: Yes, Your Honor.

THE COURT: All right. Mr. Shabazz, was it also your decision not to testify in this case?

MR. SHABAZZ: Yes, Your Honor.

THE COURT: All right. Mr. Swanson, is it your decision not to testify?

MR. SWANSON: Yes, Your Honor.

THE COURT: All right. Very well. The record is clear....

In this end-of-trial colloquy, the court did not repeat the information about the constitutional right to testify or not to testify that it had given the Defendants during its pretrial advisement.

The Hawai'i Supreme Court in *Tachibana* recommended the advisement the court below imparted before the trial started. *Tachibana*, 79 Hawai'i at 237 n. 9, 900 P.2d at 1304 n. 9 ("it would behoove the trial court, prior to the start of trial, to (1) inform the defendant of his of her personal right to testify or not to testify and (2) alert the defendant that, if he or she has not testified by the end of the trial, the court will briefly question him or her to ensure that the decision not to testify is the defendant's own decision"). We

observe, however, that what was merely recommended, is now mandatory. *State v. Lewis*, 94 Hawai'i 292, 297, 12 P.3d 1233, 1238 (2000) ("we believe there is a salutary effect to be obtained in all cases from a trial court addressing a defendant as suggested in footnote 9 [ (of *Tachibana* ) ] .... we now mandate that, in trials beginning after the date of this opinion [ (November 28, 2000) ], such advice shall be imparted by the trial courts to defendants.... This will have the beneficial effect of limiting any post-conviction claim that a defendant testified in ignorance of his or her right not to testify").

■ This being so, we recommend, with respect to the pretrial advisement now required by the supreme court, that the trial court take the few seconds necessary to confirm, on the record, each Defendant's understanding of the advisement. This confirmation will further ensure the "beneficial effect" anticipated by the *Lewis* court. *Id.* The same recommendation applies to the end-of-trial colloquy that was originally mandated in *Tachibana*, 79 Hawai'i at 236–37, 900 P.2d at 1303–4 ("we hold that in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify .... the ideal time to conduct the colloquy is immediately prior to the close of the defendant's case" (footnotes omitted)), and reaffirmed as a desideratum in *Lewis*, 94 Hawai'i at 296–97, 12 P.3d at 1237–38.

In addition, while the court below obtained the required on-the-record waivers from Defendants during its end-of-trial colloquy, the court did not then again advise them of their right to testify or not to testify. *Tachibana* requires, however, that a reiterated advisement be given during the end-of-trial colloquy. *Id.* at 236 n. 7, 900 P.2d at 1303 n. 7 ("In conducting the colloquy, the trial court must be careful not to influence the defendant's decision whether or not to testify and should limit the colloquy to advising the defendant that he or she has a right to testify, that if he or she wants to testify that no one can prevent him or her from doing so, and that if he or she testifies the prosecution will

be allowed to cross-examine him or her. In connection with the privilege against self-incrimination, the defendant should also be advised that he or she has a right not to testify and that if he or she does not testify then the jury can be instructed about that right." (Citation and brackets omitted.)).

We also observe that the court conducted its *end-of-trial colloquy after the close of all* evidence. However, it should be remembered that "the ideal time to conduct the colloquy is immediately prior to the close of [each Defendant's] case." *Id.* at 237, 900 P.2d at 1304.

### B. Jury Instructions Regarding Consent.

■ Shabazz contends on appeal that "the Court's [jury] instructions were prejudicially insufficient and misleading due to its failure to define the term 'consent[.]' " Specifically, Shabazz argues that "[t]he failure to instruct the jury that consent could be implied by conduct was especially prejudicial to [Shabazz]. The evidence in this matter did not readily support a finding of express consent. It is implied consent that is more forcefully raised by the evidence in this matter. The jury was given *no guidance* as to whether consent could be implied, and if so, what implied consent means."

The court gave the following jury instruction regarding consent:

In any prosecution, the complaining witness's consent to the conduct alleged or to the result thereof, is a defense if the consent negatives an element of the offense or precludes the infliction of the harm sought to be prevented by the law defining the offense.

Consent is not a defense if it is induced by force, duress, or deception. "Force" means any bodily impact, restraint, or confinement, or the threat thereof.

The burden is upon the prosecution to prove beyond a reasonable doubt that the complaining witness did not consent to the conduct alleged or the result thereof. If the prosecution fails to meet its burden, then you must find the defendant not guilty.

The court also instructed the jury that " 'compulsion' " means absence of consent or a threat, express or implied, that places a person in fear of public humiliation, property damage, or financial loss."

The State argues on appeal that no jury instruction defining consent was necessary, because consent in all its forms is subsumed in the plain and ordinary meaning of the word "consent." However, we have noted, in a sexual assault case, that "[w]e cannot conceive of any reason why the jury should not be instructed on the definition of consent as a matter of standard practice[,]" *State v. Jones,* 97 Hawai'i 23, 31 n. 11, 32 P.3d 1097, 1105·n. 11 (App.1998), and held that "[i]f there is any rational basis in the evidence which would support a finding of implied concurrence in the charged acts, the jury should be instructed that consent may be expressed or implied." *Id.* at 31, 32 P.3d at 1105. And we agree with Shabazz that a jury instruction defining both express and implied consent would be particularly appropriate on the record of this trial, in which the only real question before the jury was whether Complainant consented to the sexual acts, either expressly or impliedly.

### C. Lesser Included Offenses.

■ Shabazz also alleges error in the court's failure to instruct the jury on the lesser included offense of sexual assault in the third degree.[14] He reasons that "where the court agrees to instruct the jury on the included offense of Sexual Assault in the Second Degree and the defense itself requests an instruction on Sexual Assault in the Fourth Degree,[15] it is difficult to discern

14. HRS § 707–732(1)(a) (1993 & Supp.2001) provides that "[a] person commits the offense of sexual assault in the third degree if: ... The person recklessly subjects another person to an act of sexual penetration by compulsion[.]" (Enumeration omitted.)

15. HRS § 707–733(1)(a) (1993) provides that "[a] person commits the offense of sexual assault in the fourth degree if: ... The person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion[.]" (Enumeration omitted.) HRS § 707–700 defines "sexual contact" as "any touching of the sexual

any rational [basis] for not requesting an instruction on Sexual Assault in [the] Third Degree." (Footnote supplied.)

On remand, the obligation of the court with respect to jury instructions on lesser included offenses will be governed by a new standard. In *State v. Haanio,* 94 Hawai'i 405, 16 P.3d 246 (2001), the supreme court held that "trial courts are duty bound to instruct juries sua sponte regarding lesser included offenses having a rational basis in the evidence." *Id.* at 415, 16 P.3d at 256 (footnote, ellipsis and internal citation and quotation marks omitted). Given that implied consent was one of the central issues in this case, we are hard put, on the record of this trial, to justify the omission of a jury instruction on a lesser included offense pred-

icated, in part, upon a conscious disregard of a substantial and unjustifiable risk that Complainant did not consent to sexual penetration. *See* Hawai'i Revised Statutes § 702–206 (1993) (defining, *inter alia,* the term "recklessly").

## IV. Disposition.

The May 9, 2000 judgments against Crawley and Shabazz are vacated. We remand for a new trial.

---

or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly

or through the clothing or other material intended to cover the sexual or other intimate parts."